Filed 5/1/15  P. v. Nowden CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B247050 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA365005) |
| v. | |
| FRED NOWDEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie A. Swain, Judge.  Affirmed as modified with directions.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Fred Nowden, appeals his conviction for robbery (3 counts), burglary, false imprisonment by violence (5 counts) and felon in possession of a firearm, with prior serious felony conviction, prior prison term, and firearm enhancements (Pen. Code, §§ 211, 459, 236, former 12021, 667, subds. (a)-(i), 667.5, 12022.5, 12022.53).[1] He was sentenced to state prison for a term of 53 years.

The judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

On November 19, 2009, Robert Durant, Sr. and his son, Robert Durant, Jr., were living in Durant Sr.'s house on Dublin Avenue. That evening, Durant Jr.'s estranged wife, Sarah Williams-Durant, and their two children were at the house to celebrate Durant Jr.'s birthday.

Around 8:30 p.m., the doorbell rang and Durant Sr., after seeing a young boy through the window, opened the door. The boy said his mother had told him his bicycle was at this house. Durant Sr. went back to confer with Durant Jr., who said there weren't any bikes at the house. When Durant Sr. returned to the front door, two men stuck a gun in his face and pushed him inside. Defendant Nowden, another man and the boy entered the house.

Durant Jr. testified Nowden, whom he had never seen before, was wearing brown shorts, brown high-top PF Flyer basketball tennis shoes, and a white tank top. Williams-Durant testified Nowden was wearing brown-orange shorts, a white tank top, a baseball cap, and high-top shoes. Neither man was wearing a mask or any kind of face covering. Both men had guns and they ordered everyone to lie down on their stomachs and keep their heads down.

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

Durant Jr., who was sitting in the dining room under a big lit chandelier, stared at the men when they first entered. Although he initially testified he stared at them "for a second," Durant Jr. later testified: "[F]rom when you[2] came in, I sat there and I stared you in the face for a minute – for a while and . . . you did not want me to stare at you. So I sat there because I was trying to figure out . . . who you were or why were you in my house. [¶] So I sat in the chair for quite a period of time . . . staring at you and the other guy. And then that's when . . . the threats began and . . . you guys made us lay on the floor, but I sat in the chair for quite some time staring at you and the other two guys."

Williams-Durant testified one of her children "was so nervous and upset" that he "sat up against the wall and [Nowden] kept on telling him 'I'm going to kill you if you don't get on the ground. I'm going to have to kill you.' " Williams-Durant managed to get her son down on the floor. She testified she had gotten a good look at Nowden because, while she was lying on her stomach, she happened to look up for maybe five seconds and Nowden made eye contact with her from about three feet away. Nowden told Williams-Durant to put her head down or he would kill her.

Nowden bound Durant Jr.'s hands with zip-ties. Nowden told Durant Jr. it was all his fault and they were going to kill him. Durant Sr. began complaining of heart pain.

The other man and the boy took Durant Sr. to the master bedroom, where Durant Sr. kept a safe in the closet. Durant Sr. opened the safe and the man took papers, jewelry and a box of coins. Meanwhile, Nowden took cell phones from Williams-Durant and Durant Jr., jewelry from Williams-Durant, and about $2,000 in cash that Durant Jr. had in his pocket.[3] Durant Sr. was brought back from the bedroom and forced to lie on the dining room floor. He was crying and hyperventilating. The men zip-tied him and took his wallet, phone and $20.

---

[2]   Because Nowden represented himself at trial, witness testimony was often directed at him personally.

[3]   There is some dispute as to which perpetrator took which items from the victims.

The robbers had taken some socks from Durant Jr.'s room, which the boy put on his hands to use as gloves. They announced they were not leaving until Durant Jr. gave them more money. Durant Jr. said he didn't have any more. Getting a knife from the kitchen, they threatened to stab Durant Sr. if Durant Jr. did not give them what they wanted. They again threatened to kill Durant Jr., who said they didn't have to shoot him in front of his children.

Just then Durant Sr.'s cousin, who had been staying at the house, returned home. She arrived at the front door and opened it. The robbers panicked. The second man told the cousin to come in and tried to grab her, but she fled once she saw he was armed. Then the robbers fled, taking a blue duffle bag that belonged to Durant Jr. After getting free, Durant Sr. ran across the street for help but someone had already called the police.

Los Angeles Police Department Officer Sunny Sasajima responded to the 9-1-1 call. He spoke to the victims and put out a home-invasion robbery broadcast describing two of the suspects as African-American men wearing white tops and dark pants, last seen going north on Dublin Avenue.

Officer Romulo Frias and his partner Jose Gonzalez happened to be on patrol that night, driving east on Rodeo Road approaching 4th Avenue, at about 9:00 p.m. Frias saw Nowden and two other people running across Rodeo. Nowden was carrying a dark duffle bag and wearing a white shirt and dark pants. A second person was also carrying a dark duffle bag. The third person was not carrying anything. When Frias stopped his patrol car the three people stopped running, looked in his direction and immediately jumped over a wall. Frias and Gonzalez pursued them on foot. No more than a minute later, Frias heard a radio broadcast saying a burglary had taken place down the block on Dublin Avenue and that the perpetrators had just left the crime scene. Frias concluded the people jumping the wall were possible suspects in that crime, so he radioed for a perimeter to be established.

Officer Mike Santiago responded to Rodeo Road just west of 6th Avenue as part of the perimeter force. A resident came out of 2529 Rodeo and said there was an intruder

at the rear of his house. Santiago then saw Nowden run across Rodeo Road and south on 6th Avenue before losing sight of him.

Officer Steven Carnevale and his search dog, Rex, were called to the scene. Their search began about 10:00 p.m. At one point, Rex showed interest in a house at 3753 6th Avenue. They left to search elsewhere, but returned to this house 30 minutes later. Rex disappeared into a screened-in patio in the back yard and barked. Carnevale saw Rex tugging at a human leg protruding from a cabinet. Nowden was ordered from his hiding place and arrested. He was unarmed, there was blood on his shirt and his pants were torn. He had lacerations on his hands. This was at about 1:00 a.m. Officer Frias came to the location and identified Nowden as the man he had seen running across the street and jumping over the wall.

A patrol car brought Nowden to a command post which had been established at 3rd Avenue and Rodeo Road, about three or four blocks from where Nowden had been apprehended, and two or three blocks from the Durant house. An officer testified this command post was used "[b]ecause that is what's considered a safer zone. Remember, we're looking for three suspects all presumed to be armed, so . . . we move you from that spot and take you to a safer spot, more controlled spot for medical attention, which you needed and for the show-ups." Officers brought Durant Sr. and Durant Jr. to the command post to have a look at him. Durant Sr. could not identify Nowden, but Durant Jr. did. Williams-Durant arrived with another officer and she also identified Nowden.

In front of Durant Sr.'s house, police found a bag of blue pills which appeared to be the drug Ecstasy. Durant Jr. identified a knife found at the foot of a wall in the back yard of a house on the corner of 4th Avenue and Rodeo Road as the one the robbers had taken from the kitchen. Also near this wall were a glove, two socks and a dark blue duffle bag. A second duffle bag was found inside the back yard. Durant Jr. identified the socks and one of the duffel bags as his own. Inside the duffle bags police found a large amount of marijuana, two digital scales, and boxes containing clear plastic baggies. The baggies appeared to match 20 baggies police found in one of the bedrooms of the Durant

5

house.  Officer Frias testified the two duffle bags appeared to be the same bags he had seen the suspects carrying when they ran across Rodeo Road.  Inside a trash can in the Durants' driveway, police found a rusty handgun and a rusty magazine containing ten rounds of live ammunition.

2. *Defense evidence.*

Nowden testified in his own defense.  He claimed to be a drug dealer and testified that at the time of the Durant home invasion he had been taking part in a drug transaction elsewhere.  He had made arrangements with a female friend, a fellow drug dealer, to purchase marijuana from her business connections.  Nowden drove in from Orange County and was picked up by his friend.  They were supposed to meet the sellers on Rodeo Road and exchange duffle bags.

His friend parked and they proceeded to walk down Rodeo Road.  Nowden, who was not armed, was carrying $45,000 and two scales in a black duffle bag.  They approached the sellers, two men and a woman, at about 8:45 p.m.  The two men were carrying nine pounds of marijuana in two blue duffle bags.  Nowden asked the sellers if they also had cocaine.  They did not, but they did have Ecstasy pills which they offered to include in the deal.  They were all headed to a nearby carport to complete the transaction when a police car suddenly approached, so the group dispersed.  Nowden and his partner put the scales in the bags with the marijuana and they ran, Nowden holding both duffle bags.  He jumped over a wall and stashed the bags behind a house facing Rodeo Road so he could retrieve them later.  Then he kept running.  He hid behind a house and was subsequently apprehended.  He could not say how the duffle bags ended up on 4th Avenue.

**CONTENTIONS**

1. The trial court erred by admitting evidence of the in-field showup identifications.

2. There was prosecutorial misconduct.

3. This court should independently examine the in camera *Pitchess* hearing.

4. There was cumulative error.

6

5. Nowden's sentence amounted to cruel and unusual punishment.

6. Nowden is entitled to an additional day of presentence custody credit.

## DISCUSSION

1. *Evidence of the in-field showup identifications was properly admitted.*

Nowden contends his convictions must be reversed because the eyewitness identifications of him at the in-field one-person showup were tainted and should not have been admitted into evidence at trial. This claim is meritless.

a. *Legal principles.*

" 'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.' [Citation.] 'We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive.' [Citation.] 'Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification.' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 901-902.)

The defendant bears the burden of showing an identification procedure was unfair "as a demonstrable reality, not just speculation." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

"A 'lineup' is a relatively formalized procedure wherein a suspect, who is generally already in custody, is placed among a group of other persons whose general appearance resembles the suspect. The result is essentially a test of the reliability of the

victim's identification.  [Citation.]  The requirement of counsel's presence encourages the police to adopt regulations ensuring the fairness of such procedures.  [Citation.]  An in-the-field showup, on the other hand, is generally an informal confrontation involving only the police, the victim and the suspect.  One of its principal functions is a prompt determination of whether the correct person has been apprehended.  [Citation.]  Such knowledge is of overriding importance to law enforcement, the public and the criminal suspect himself.  [Citation.]  An in-the-field showup is not the equivalent of a lineup.  The two procedures serve different, though related, functions, and involve different considerations for all concerned."  (*People v. Dampier* (1984) 159 Cal.App.3d 709, 712-713.)

        b. *Trial court ruling*.

The trial court denied Nowden's motion to suppress the in-field showup identifications on the ground he failed to demonstrate the procedure had been unduly suggestive.  The court characterized the identification procedure as nothing more than a typical in-field, one-person showup.  This included the usual factors that the eyewitnesses had been brought to a location where Nowden was handcuffed and in the custody of armed police officers, and the witnesses were asked if he was one of the people who had invaded their home.  The trial court pointed out that while three of the eyewitnesses identified Nowden at the showup,[4] Durant Sr. could not identify him, which tended to show the procedure had not been unduly suggestive.  The court concluded:  "[T]here is nothing . . . in the facts of this case which suggests to me that there is anything unduly suggestive or prejudicial about this one person show-up."

---

[4]    Durant Jr. and Williams-Durant identified Nowden at the showup and so did their older son, who was 10 or 11 years old at the time.  However, the child did not testify at Nowden's trial.

c. *Discussion.*

Nowden contends the in-field showup was impermissibly suggestive. He argues the witnesses were driven in police cars to the command post – a street lined on both sides with police cars – where he was taken, handcuffed, from a police car by two officers who showed him to the witnesses while spotlights were shined on him. He also complains his white shirt was bloody and his pants were torn. He contends the entire procedure was unnecessary and that it would have been "a simple matter, and of course a much fairer matter, to put appellant's photograph in a six-pack for viewing by the victims the next day." We disagree.

The prosecution was not required to demonstrate there had been some special necessity for holding the in-field showup. "Appellant contends, incorrectly, that single-person show-ups are impermissible absent a compelling reason. To the contrary, single-person show-ups *for purposes of in-field identifications* are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended. [Citation.] The law permits the use of in-field identifications arising from single-person show-ups so long as the procedures used are not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. [Citation.]" (*In re Carlos M*. (1990) 220 Cal.App.3d 372, 387.) Here, the police had detained a possible suspect in an armed home invasion case. As far as the police knew, all three suspects were at large in this residential neighborhood. It was obviously important to determine as quickly as possible if Nowden was one of the perpetrators.

Nowden complains about the handcuffs and all the officers and patrol cars that were present during the show-up. But such procedures have not been held to be unduly suggestive. (See *In re Carlos M*., *supra*, 220 Cal.App.3d at pp. 386-387 [defendant was handcuffed when viewed by victim]; *In re Richard W*. (1979) 91 Cal.App.3d 960, 969-970 [defendant sat handcuffed in back of police car with officers standing around];

9

*People v. Craig* (1978) 86 Cal.App.3d 905, 914 [defendants were inside police car and officers stood around outside]; *People v. Anthony* (1970) 7 Cal.App.3d 751, 759, 764 [officers drove defendant and companion to crime scene in marked police vehicle, handcuffed, and asked the witness " 'which was the one that came in' " and committed the robbery]; *People v. Gomez* (1976) 63 Cal.App.3d 328, 335-337 [defendant stood outside a patrol car, was handcuffed and accompanied by two officers].)

The use of spotlights was understandable because this identification procedure took place at 1:00 a.m., and Nowden fails to show how it rendered the procedure unduly suggestive. (See *United States v. Pickar* (8th Cir.2010) 616 F.3d 821, 828 [showup not unduly suggestive where defendant "was handcuffed and standing in front of a marked police cruiser . . . between an officer in uniform and an officer in plainclothes, with one of the officers shining a small flashlight in [his] face"].) Nor can we see how the condition of Nowden's clothing made the procedure unduly suggestive. Since no blood had been shed inside the Durant home, we do not understand how the blood on his shirt[5] would have signaled to the witnesses that he was one of the perpetrators. Nowden does not suggest how his torn pants tied him to the crime scene, or how the sound of sirens made the procedure unduly suggestive.

Citing subsequent trial testimony from Durant Jr. and Williams-Durant,[6] Nowden questions whether the eyewitnesses had been given a standard admonishment before

---

[5]     Nowden had apparently been injured resisting the police dog.

[6]     Nowden cites Durant Jr.'s testimony that officers did not say anything at all to him before he was taken to view Nowden, and Williams-Durant's testimony that an officer told her only that she was being taken to view a possible suspect. But this evidence was not before the trial court at the time of its ruling on Nowden's suppression motion and, therefore, it is irrelevant. (See, e.g., *In re Arturo D.* (2002) 27 Cal.4th 60, 77, fn. 18 ["As the Attorney General observed in his briefs, subsequent to the *suppression hearing* (the ensuing ruling of which we review here), Arturo testified at the *jurisdictional* hearing that he in fact gave the registration document to the officer. This testimony was not before the trial court at the time of the suppression hearing, and it is irrelevant to our inquiry now; in reviewing the trial court's suppression ruling, we consider only the evidence that was presented to the trial court at the time it ruled."]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1007-1008 and fn. 23 [rejecting defendant's reliance on trial evidence to overturn

viewing him. He points out that at the suppression hearing there was no direct testimony about this. The Attorney General, however, argues the "undisputed evidence at the [suppression] hearing, based on the police reports, was that all three of the adult victims received standard admonitions." At the suppression hearing, the prosecutor told the trial court that an arrest report described the in-field showup as follows: "Victim 1 [i.e., Williams-Durant] was advised of a field show-up admonishment. The officers conducted a field show-up during which victim . . . positively identified [Nowden] as one of the suspects and they [*sic*] describe what they saw him do. Victim 2 [i.e., Durant Sr.] same process, but unable to identify the defendant and victim 3 [i.e., Durant Jr.], same process." Based on this evidence, the trial court assumed admonitions had been given. We agree with the Attorney General that, "to the extent that no one testified regarding the admonitions that is simply because no witness was asked that question by either party, including appellant, who represented himself. Thus, any absence of information regarding the issue at trial was the result of appellant failing to develop the record."

In any event, even if no admonitions had been given, Nowden has failed to cite any authority holding that a particular admonition, or any admonition at all, must be given prior to holding a one-person showup. As our Supreme Court has pointed out, "Of course, '[a]nyone asked to view a lineup would naturally assume the police had a suspect.' " (*People v. Avila* (2009) 46 Cal.4th 680, 699.) Nowden has failed to show the police did or said anything to unfairly encourage the victims to identify him.

Because we conclude the in-field showup here was not unduly suggestive, we hold the identification evidence was properly admitted without having to reach the question of the reliability of the resulting identifications. (See *People v. Alexander*, *supra*, 49 Cal.4th at p. 902.)

---

trial court's denial of motion to suppress evidence: "the trial evidence relied upon by defendant was not before the trial court when it ruled on the motion to exclude [the witness's] testimony"].)

11

2. *Prosecutorial misconduct.*

Nowden contends the prosecutor committed misconduct during closing argument by incorrectly telling the jury that two other suspects had been arrested in this case. This claim is meritless.

a. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citation.] [¶] ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) A defendant who fails to object at trial "waive[s] any error or misconduct emanating from the prosecutor's argument that could have been cured by a timely admonition." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1105.)

" ' "[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." ' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752.) "When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 689.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an

12

improper or erroneous manner.  [Citations.]  In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements."  (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

b.  *Background.*

During closing argument, the prosecutor pointed out that both Durant Jr. and Williams-Durant had given the police very specific descriptions of Nowden's clothing. The prosecutor then said:  "Now, the descriptions, as I said before, of all three suspects were given prior to the defendant's capture *and clearly prior to the other suspects' capture* and it includes in that description brown shorts and brown shoes with the gun, so make sure you take a look at that and the PF Flyers photographs."  (Italics added.)

Nowden did not object to the italicized statement.

Following his conviction, Nowden sought post-judgment discovery, asserting that if other suspects had been caught he should have been informed.  The trial court indicated it had no idea what the prosecutor might have been referring to because there was no evidence at trial that any other suspects had ever been arrested.  The prosecutor arguing the post-judgment motion was not the prosecutor who tried the case, but said he had spoken with the trial prosecutor and been informed that all of the police reports had been turned over to Nowden.  The trial court instructed the current prosecutor to contact the trial prosecutor and ask what he had been referring to when he made this statement.

The current prosecutor subsequently reported back that the trial prosecutor confirmed all police reports had been turned over and that there was nothing in the reports to indicate any other suspects had been arrested.  The trial prosecutor said the disputed remark must have been a mistranscription because he could not recall having said anyone other than Nowden had ever been arrested.

The trial court considered this information to be "an offer of proof that there were no other suspects apprehended; that it was either a mistranscription by the court reporter or . . . that [the trial prosecutor] himself misspoke, but that . . . there were no other suspects apprehended."  The trial court then denied Nowden's discovery motion, adding:

13

"If you have some evidence . . . other than [the prosecutor's] off-hand statement in his closing argument that there were other people apprehended in this matter, bring it to me and I will further investigate it."

   c. *Discussion.*

  Nowden's prosecutorial misconduct claim has been forfeited because he neither objected to the trial prosecutor's statement nor asked for an appropriate admonition. (See *People v. McDermott* (2002) 28 Cal.4th 946, 1001 ["Generally, ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' "].) Although we would normally bypass this problem in the interest of judicial economy (see *People v. Turner* (1990) 50 Cal.3d 668, 708-709 [merits addressed to forestall inevitable ineffective assistance of counsel claim]), that course is unavailable here because Nowden represented himself at trial. (See *People v. Weber* (2013) 217 Cal.App.4th 1041, 1057-1058 [self-represented defendant must " 'follow the same rules that govern attorneys . . . and he will lose the right to appeal his case on the grounds of ineffective assistance of counsel' "].)

  In any event, Nowden's claim has no merit. It appears from the record the statement was, at most, an innocent slip of the tongue by the prosecutor. Moreover, we fail to see how it could have prejudiced Nowden. As the Attorney General points out, Nowden "fails to establish how his defense of mistaken identity was harmed by an off-hand comment about the capture of other suspects." Nowden argues the misstatement "would cause the jurors . . . to conclude that appellant's account at trial of his actions . . . was fabricated and that he was indeed the third suspect." We fail to see the logic of this argument. It was undisputed that three people had invaded the Durant home; we cannot understand why a belief that two other people had been apprehended would cause a reasonable juror to reflexively conclude Nowden must have been the third perpetrator.

  For all of these reasons, we reject Nowden's claim of prosecutorial misconduct.

3. *Review of in camera* Pitchess *hearing shows there was no error.*

Nowden requests review of the trial court's ruling on his motion seeking discovery under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.  Review of the in camera hearing by this court reveals no abuse of the trial court's discretion.  (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1232.)  The hearing was properly conducted; the custodian of records described the records that were searched and the trial court described the nature of all the complaints against the officers.

Nowden asserts we must do more than merely review the transcript of the in camera hearing "because the review should also encompass the sealed personnel files."  However, although Nowden cites cases in which a court engaged in this kind of further review, those cases did not hold such review was required.  In *People v. Guevara* (2007) 148 Cal.App.4th 62, the appellate court remanded for a new *Pitchess* hearing because the custodian of records had not submitted any documents from the officers' personnel files to the trial court, nor did the record reflect the trial court had looked at a sealed list of documents the custodian had reviewed.  (*People v. Guevara*, *supra*, 148 Cal.App.4th at pp. 67-69.)  In *People v. Hughes* (2002) 27 Cal.4th 287, 330, and *People v. Samayoa* (1997) 15 Cal.4th 795, 826-827, it appears our Supreme Court merely reviewed personnel files that had already been made part of the record on appeal.

There was no *Pitchess* error.

4. *There was no cumulative error.*

Nowden contends that, even if harmless individually, the cumulative effect of these claimed trial errors mandates reversal of his convictions.  Because we have found no errors, his claim of cumulative error fails.  (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

5. *Nowden's sentence did not constitute cruel and unusual punishment.*

Nowden contends his 53-year prison sentence constitutes cruel and unusual punishment under the California and United States Constitutions.  This claim is meritless.

15

a. *Legal principles.*

"A punishment is excessive under the Eighth Amendment if it . . . is 'grossly out of proportion to the severity of the crime.' (*Gregg v. Georgia* (1976) 428 U.S. 153, 173 [96 S.Ct. 2909, 2925].)  A punishment may violate article I, section 17 of the California Constitution if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' (*In re Lynch* (1972) 8 Cal.3d 410, 424 . . . , fn. omitted.) [¶]  In determining whether a particular punishment is cruel and/or unusual, courts examine the nature of the particular offense and offender, the penalty imposed in the same jurisdiction for other offenses, and the punishment imposed in other jurisdictions for the same offense.  (*Solem v. Helm* (1983) 463 U.S. 277, 290-291 [103 S.Ct. 3001, 3009-3010]; *In re Lynch, supra*, 8 Cal.3d at pp. 425-427.)" (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 199.)

Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual.  The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature.  Perhaps foremost among these are the definition of crime and the determination of punishment. [Citations.]  While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17, the validity of enactments will not be questioned 'unless their unconstitutionality clearly, positively, and unmistakably appears.' [Citation.]" (*People v. Wingo* (1975) 14 Cal.3d 169, 174, fn. omitted.)  Federal law is to the same effect.  (See *Harmelin v. Michigan* (1991) 501 U.S. 957 [111 S.Ct. 2680] [mandatory sentence of life without possibility of parole for possessing 672 grams of cocaine did not violate Eighth Amendment].)

b. *Discussion.*

The trial court sentenced Nowden as follows.  On count 1 (robbery), the court imposed a high term of nine years, doubled to 18 years under the Three Strikes law, with an additional 10-year firearm enhancement and an additional five-year prior serious felony conviction enhancement, for a total of 33 years  On counts 2 and 3 (robbery), the

court imposed two consecutive terms of seven years and four months each, consisting of one-third the robbery midterm doubled under the Three Strikes law, plus a firearm use enhancement. On counts 8 and 9 (false imprisonment against the two child victims), the court imposed consecutive terms of two years and eight months for each count, consisting of one-third the midterms doubled under the Three Strikes law, plus a firearm use enhancement. The court said it was imposing these consecutive terms because the crimes involved separate threats of violence to separate victims, particularly vulnerable victims (i.e., the young two children and Durant Sr., who was hyperventilating during the incident), and a high degree of cruelty/callousness/viciousness.

On count 4 (burglary) the court imposed and stayed a 14-year term. On counts 5, 6 and 7 (false imprisonment by violence against the adult victims), the court imposed and stayed eight-year terms. On count 10 (possession of firearm by felon), the court imposed and stayed a four-year term.

Nowden's total sentence came to 53 years.

Nowden argues this sentence was disproportionate to his offense, which he characterizes as "a 20-minute home invasion robbery with a gun, in concert with two others, of three adults and felony false imprisonment of two children" in a situation where "one (and possibly more than one) of the adult victims was, according to the prosecutor, a criminal and that no one was physically injured during the incident." Nowden makes much of the fact the prosecutor acknowledged to the jury the evidence seemed to show that at least Durant Jr., and possibly Durant Sr., too, were involved in trafficking marijuana. But crimes against criminals are still crimes, at least where the defendant has not successfully pursued a claim-of-right defense.[7]

---

[7] "The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery. At common law, a claim of right was recognized as a defense to larceny because it was deemed to negate the *animus furandi*, or intent to steal, of that offense. (See 4 Blackstone, Commentaries 230 (Blackstone).)" (*People v. Tufunga* (1999) 21 Cal.4th 935, 938.) In the usual claim-of-right cases there is some facially legitimate reason for asserting a good faith belief in the

17

.    Nowden downplays the severity of his criminal record, arguing he has never before been sent to prison.  However, he acknowledges that, as an adult, he has committed 13 misdemeanors and 2 felonies.  And while some of the misdemeanor convictions were for relatively minor offenses, the felony convictions were for grand theft person (1993) and assault with a semi-automatic firearm (2001).

Citing *People v. Dillon* (1983) 34 Cal.3d 441, Nowden argues his sentence was disproportionate to his offense.  But there is no just comparison.  Dillon killed a man who had been guarding a marijuana crop which Dillon and his friends were trying to steal.  The trial evidence proved Dillon was an extremely immature 17-year-old who reacted emotionally "by denying the reality of stressful events and living rather in a world of make-believe." (*Id*. at p. 483.)  Dillon had fired his .22-caliber rifle out of fear and panic as the victim was advancing on him with a shotgun.  Thus, Dillon killed the victim as "a response to a suddenly developing situation that [Dillon] perceived as putting his life in immediate danger." (*Id.* at p. 488.)  The *Dillon* case has almost nothing in common with Nowden's crimes.

Nowden complains the sentence is not commensurate with the severity of the offense because a conviction for first degree murder with use of a knife would have resulted in a sentence of only 26 years to life.  But the length of Nowden's sentence was driven by the fact there were multiple victims (five in all, including two young children and an ailing elderly man), and there had been a mandatory doubling of his prison terms under the Three Strikes law.

Nowden argues his sentence is the functional equivalent of life without possibility of parole because he was 38 years old at the time of sentencing.  However, his sentence is not unconstitutional just because it may effectively be one for life without possibility of

_____

right to another's property.  (See *People v. Marsh* (1962) 58 Cal.2d 732, 737 [trial court improperly excluded evidence defendants' belief in curative power of electrical apparatus was based on information from doctors and scientists]; *People v. Russell* (2006) 144 Cal.App.4th 1415, 1429-1431 [trial court improperly denied claim-of-right instruction where defendant testified he believed motorcycle had been abandoned].)

18

parole. (See *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382-1383 [sentence of 115 years plus 444 years to life not unconstitutional]; accord *People v. Ayon* (1996) 46 Cal.App.4th 385, 396, disapproved on other grounds by *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10 [240 years to life]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666-667 [283 years]; *People v. Huber* (1986) 181 Cal.App.3d 601, 633-635 [106 years]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531-532 [129 years].)

Nowden's sentence did not constitute cruel and unusual punishment.

6. *Correction of presentence custody credit calculation*.

Nowden contends he is entitled to an additional one day of presentence custody credit. The Attorney General properly concedes this claim has merit. "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered. [Citation.]" (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647; see also *People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8 ["The failure to award an adequate amount of credits is a jurisdictional error which may be raised at any time."].)

Nowden was arrested on November 20, 2009, and sentenced on February 8, 2013. The trial court awarded him 1,176 actual days of presentence custody credit, but the correct calculation is 1,177 days. The parties agree he was entitled to a total of 1,353 days of total presentence credit.

## DISPOSITION

The judgment will be modified to reflect that Nowden was entitled to one additional day of presentence custody credit. As modified, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.